**INSTITUTE FOR JUSTICE**
Andrew Ward (NY Bar No. 5364393)*
Dylan Moore (ME Bar No. 010327)*
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
ahward@ij.org
dmoore@ij.org

*Admitted *pro hac vice*

**SULLIVAN & CROMWELL LLP**
Brendan P. Cullen (CA Bar No. 194057)
550 Hamilton Avenue
Palo Alto, CA 94301
(650) 461-5650
cullenb@sullcrom.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

| | |
|---|---|
| JOEL FINK,<br><br>                    Plaintiff,<br>v.<br><br>KIMBERLY KIRCHMEYER, in her official capacity as Director of the California Department of Consumer Affairs; and LYNNE JENSEN, in her official capacity as Bureau Chief of the Bureau of Security and Investigative Services,<br><br>                    Defendants. | No.: 3:23-cv-05921-RFL<br><br>**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS**<br><br>Judge: Rita F. Lin<br><br>Date: February 6, 2024<br>Time: 10:00 AM<br>Courtroom: 15 |

1

**TABLE OF CONTENTS**

2

3  TABLE OF AUTHORITIES ................................................................................................. iii

4  STATEMENT OF THE ISSUE ........................................................................................... vii

5  INTRODUCTION ................................................................................................................. 1

6  STATEMENT OF THE FACTS ........................................................................................... 1

7  I.   Mr. Fink Stands up to Spam by Reviewing Clients' Junk Folders. .................................. 1

8  II.  The Bureau Cites Mr. Fink for Reviewing Email Without a License. ............................... 2

9  LEGAL STANDARD ........................................................................................................... 4

10  ARGUMENT ........................................................................................................................ 4

11  I.   Mr. Fink's Complaint States a First Amendment Claim. .................................................. 4

12       A.  Analogous cases support Mr. Fink. ............................................................................ 4

13       B.  This case is about speech, not conduct. ...................................................................... 6

14       C.  Strict scrutiny applies. ................................................................................................ 8

15       D.  Mr. Fink states a claim under any level of First Amendment scrutiny. ..................... 10

16  II.  Mr. Fink's Complaint States a Substantive Due Process Claim. ...................................... 12

17  III. Mr. Fink's Complaint States an Equal Protection Claim. .................................................. 14

18  CONCLUSION ....................................................................................................................... 15

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) .................................................................................... 6

4

5

*Argello v. City of Lincoln*,
    143 F.3d 1152 (8th Cir. 1998) ..................................................................... 8

6

*Ariz. Att'ys for Crim. Just. v. Ducey*,
    638 F. Supp. 3d 1048 (D. Ariz. 2022) ......................................................... 7

7

8

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ............................................................... 12, 14

9

10

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
    824 F.3d 858 (9th Cir. 2016) .................................................................. 4, 14

11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................. 13

12

13

*Ashton v. Kentucky*,
    384 U.S. 195 (1966) .................................................................................... 6

14

15

*Billups v. City of Charleston*,
    961 F.3d 673 (4th Cir. 2020) ..................................................................... 11

16

*Bunyan v. Camacho*,
    770 F.2d 773 (9th Cir. 1985) ..................................................................... 12

17

18

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022) ................................................................................... 8, 9

19

20

*Cornwell v. Hamilton*,
    80 F. Supp. 2d 1101 (S.D. Cal. 1999) ............................................ 12, 14, 15

21

*Daien v. Ysursa*,
    711 F. Supp. 2d 1215 (D. Idaho 2010) ...................................................... 12

22

23

*Dragovich v. U.S. Dep't of Treasury*,
    764 F. Supp. 2d 1178 (N.D. Cal. 2011) .................................................... 12

24

25

*Eastern Profit Corp. v. Strategic Vision US LLC*,
    No. 18-cv-2185, 2021 WL 2554631 (S.D.N.Y. June 22, 2021) .................. 7

26

*Edenfield v. Fane*,
    507 U.S. 761 (1993) .................................................................................. 10

27

28

-iii-

1
2
*Fowler Packing Co. v. Lanier*,
   844 F.3d 809 (9th Cir. 2016)...........................................................................4, 12

3
*Full Circle of Living & Dying v. Sanchez*,
   No. 2:20-cv-001306, 2023 WL 373681 (E.D. Cal. Jan. 23, 2023) ...................5, 12

4
5
*Geiger v. Kitzhaber*,
   994 F. Supp. 2d 1128 (D. Or. 2014) .......................................................................12

6
7
*Golinski v. U.S. Off. of Pers. Mgmt.*,
   824 F. Supp. 2d 968 (N.D. Cal. 2012) ...................................................................12

8
*Gray v. Department of Public Safety*,
   248 A.3d 212 (Me. 2021) .......................................................................................11

9
10
*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) .....................................................................................................6

11
*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020).................................................................................8

12
13
*In re Levenson*,
   587 F.3d 925 (9th Cir. 2009)..................................................................................12

14
15
*Italian Colors Rest. v. Becerra*,
   878 F.3d 1165 (9th Cir. 2018)................................................................................10

16
17
*Junior Sports Mags. Inc. v. Bonta*,
   80 F.4th 1109 (9th Cir. 2023)................................................................................11

18
*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009)................................................................................10

19
20
*Lazy Y Ranch Ltd. v. Behrens*,
   546 F.3d 580 (9th Cir. 2008).............................................................................12, 14

21
22
*Lazy Y Ranch, Ltd. v. Wiggins*,
   2007 WL 1381805 (D. Idaho Mar. 13, 2007) .......................................................12

23
*Lockary v. Kayfetz*,
   917 F.2d 1150 (9th Cir. 1990)................................................................................12

24
25
*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
   922 F.3d 946 (9th Cir. 2019)..................................................................................13

26
*McCullen v. Coakley*,
   573 U.S. 464 (2014) .........................................................................................10, 11

27
28
*Merrifield v. Lockyer*,
   547 F.3d 978 (9th Cir. 2008)..........................................................................12, 14, 15

-iv-

*Monarch Beverage Co. v. Cook*,
   861 F.3d 678 (7th Cir. 2017)................................................................................15

*N. Pacifica LLC v. City of Pacifica*,
   526 F.3d 478 (9th Cir. 2008)................................................................................15

*Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psych.*,
   228 F.3d 1043 (9th Cir. 2000)................................................................................8

*Navarro v. Block*,
   72 F.3d 712 (9th Cir. 1995)................................................................................12

*Nat'l Inst. of Fam. & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018).........................................................................5, 6, 7, 9

*Nutt v. Ritter*,
   No. 7:21-cv-00106-M, 2023 WL 9067799 (E.D.N.C. Dec. 20, 2023).........................5, 9, 10

*O'Day v. George Arakelian Farms, Inc.*,
   536 F.2d 856 (9th Cir. 1976)................................................................................12

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020)................................................................................7

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
   961 F.3d 1062 (9th Cir. 2020)................................................................1, 5, 6, 7

*Parks v. Watson*,
   716 F.2d 646 (9th Cir. 1983)................................................................................12

*Petzak v. Nevada ex rel. Dep't of Corr.*,
   579 F. Supp. 2d 1330 (D. Nev. 2008)......................................................................12

*Project Veritas v. Schmidt*,
   72 F.4th 1043 (9th Cir. 2023)................................................................................9

*Pruitt v. Cheney*,
   963 F.2d 1160 (9th Cir. 1991)................................................................................12

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)................................................................................8

*Richwine v. Matuszak*,
   No. 1:23-cv-00370, 2023 WL 8747471 (N.D. Ind. Dec. 19, 2023).........................5, 6

*Sadri v. Ulmer*,
   2007 WL 869192 (D. Haw. Mar. 21, 2007).................................................................12

*Servin-Espinoza v. Ashcroft*,
  309 F.3d 1193 (9th Cir. 2002)..............................................................12

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)....................................................................1, 5, 6, 7

*St. Joseph Abbey v. Castille*,
  712 F.3d 215 (5th Cir. 2013)................................................................12

*Tingley v. Ferguson*,
  47 F.4th 1055 (9th Cir. 2022)................................................................7

*United States v. O'Brien*,
  391 U.S. 367 (1968)................................................................................6

*Upsolve, Inc. v. James*,
  604 F. Supp. 3d 97 (S.D.N.Y. 2022).......................................................5

*Walsh v. City & County of Honolulu*,
  460 F. Supp. 2d 1207 (D. Haw. 2006)..................................................12

**RULES**

Fed. R. Civ. P. 8(a)(2) ..............................................................................13

**STATE CODES**

Cal. Bus. & Prof. Code § 7520 ...................................................................3

Cal. Bus. & Prof. Code § 7521 ...................................................................3

Cal. Bus. & Prof. Code § 7522(a) ..............................................................3

Cal. Bus. & Prof. Code § 7523 ...................................................................3

Cal. Bus. & Prof. Code § 7541(a) ..............................................................4

Cal. Bus. & Prof. Code § 7541.1(a) ...........................................................4

Cal. Bus. & Prof. Code § 7542 ...................................................................3

Cal. Bus. & Prof. Code § 7542.1 ................................................................3

Cal. Bus. & Prof. Code § 7542.12(b) .........................................................3

Cal. Bus. & Prof. Code § 17529.5(a) .........................................................2

Cal. Code Regs. tit. 16, § 605 ....................................................................4

Cal. Code Regs. tit. 16, § 639 ....................................................................4

1

**STATEMENT OF THE ISSUE**

2

   Whether the Plaintiff has stated plausible claims that the State of California's application

3

of its private-investigator licensing requirements as to Plaintiff's review of his clients' emails

4

violates the First and Fourteenth Amendments.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2          Plaintiff Joel "Jay" Fink's business helps Californians fight back against spam emails. He

3   reviews his clients' junk folders, flags the emails that might violate California's anti-spam law,

4   and creates a list of the offending emails. From there, clients may use Mr. Fink's lists to pursue

5   litigation under the anti-spam law. In the past decade, hundreds of Californians have benefitted

6   from Mr. Fink's useful—and inherently communicative—service.

7          Despite the simplicity and popularity of Mr. Fink's business, the California Bureau of

8   Security and Investigative Services ordered him to cease reviewing his clients' emails because he

9   is not a licensed private investigator. But obtaining a license is no small task. To get one, Mr. Fink

10  would need to endure *6,000 hours* of training in a field like law enforcement, insurance adjustment,

11  or arson investigation—none of which has to do with identifying spam. So, last November, Mr.

12  Fink sued to enjoin enforcement of the private-investigator licensing laws against him. The Bureau

13  now moves to dismiss the suit for failure to state a claim. ECF No. 18.

14         The Constitution compels a different outcome. Mr. Fink (with his team) reads, repackages,

15  and shares information. The "creation and dissemination of information are speech within the

16  meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). No matter

17  how the Bureau labels Mr. Fink's activities, it cannot evade meaningful First Amendment review

18  "by simply imposing a licensing requirement." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,

19  961 F.3d 1062, 1069 (9th Cir. 2020) (quotation omitted). California's burdensome and irrelevant

20  6,000-hour training requirement cannot possibly withstand any level of scrutiny. The Bureau's

21  motion to dismiss should therefore be denied.

22

**STATEMENT OF THE FACTS**

23         Mr. Fink set out the facts in his motion for a preliminary injunction. ECF No. 15 at

24  2–5. For convenience, he offers them here too, with citations to the complaint (ECF No. 1).

25  **I.   Mr. Fink Stands up to Spam by Reviewing Clients' Junk Folders.**

26         Jay Fink, a Bay Area entrepreneur, helps Californians prepare evidence for use in civil suits

27  against deceptive email spammers. His business stems from the late 2000s, when he found himself

28  on the wrong end of aggressive spam campaigns. Mr. Fink was receiving over 500 spam emails

each day and wasting hours separating genuine email from junk. Compl. ¶ 14. He realized he could regain control of his time (and his inbox) by holding spammers accountable under California's anti-spam act. ¶¶ 16–18. The act creates liability for three types of unsolicited, deceptive commercial emails: emails containing: (1) "a third-party's domain name without the permission of the third party"; (2) "falsified, misrepresented, or forged header information"; or (3) "a subject line that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message." Cal. Bus. & Prof. Code § 17529.5(a).

Armed with the anti-spam act, Mr. Fink successfully took his spammers to small-claims court. ¶¶ 16–18. Then he realized that others would want to help clean up the internet too. ¶ 19. So (with no idea California imposed private-investigator licensing) Mr. Fink founded a sole proprietorship called Spam Private Eye in 2011. *Id.* Today, he has a team of three. ¶ 20.

His process is straightforward: Californians receiving unwanted, deceptive spam emails hire Mr. Fink and his team to help them prepare evidence for civil lawsuits under the anti-spam act. ¶ 23. He searches their spam or junk folder for emails that might fall into one of the three prohibited categories and makes a list of them. (He also PDFs the emails.) ¶ 25. Clients, if they choose, can then engage lawyers and, ultimately, use those emails as evidence. ¶ 26. Mr. Fink is paid on contingency from any recovery. ¶ 22.

In short, Mr. Fink receives information from clients, reads that information, repackages it, and shares it. Simple as that may seem, over the last twelve years, he (and his team) reviewed hundreds of thousands of emails and helped hundreds of Californians recover against malicious spammers, including predatory payday lenders and sham corporations. ¶¶ 27–28.

## II.  The Bureau Cites Mr. Fink for Reviewing Email Without a License.

Things went awry in July 2023, however, when the California Bureau of Security and Investigative Services began investigating Mr. Fink for unlicensed private investigating. A Bureau analyst advised Mr. Fink (¶¶ 33–37 & Ex. 1) that his business was illegal:

> To recap our telephone conversation:
> - You are contacted for an investigation,

- You draft a contract for the client with no upfront fees only a built-in back end payment after any settlement is recovered through lawsuit:
- You review the client's email account information to determine if they have received Spam emails,
- You make PDF's of client's alleged Spam emails,
- Your clients provides your findings to their attorney or attorney's you refer them to,
- If there is a recovery of funds through lawsuit you receive 30% of the recovery from the clients lawsuit.

Your investigations are not public in nature and/or utilizing public resources, you are conducting private investigations of a person's private information, for a percentage of the recovery of a lawsuit, through a written contract, which are later used in a court to seek a settlement.

These are private investigations that you are conducting and seeking payment for.

To perform this work in the State of California you must be issued a Private Investigator license from the Bureau.

All this is based on an exceptionally broad law. Although the law appears mostly concerned with weapons,[1] the legal definition of "private investigator" is expansive. It covers "any investigation" into the "location . . . of lost . . . property," the "cause [of] accidents[] or damage or injury to persons or to property," or even the "acts . . . of any person." Cal. Bus. & Prof. Code § 7521. And, as relevant here, it covers any "person . . . who, for any consideration whatsoever engages in business or accepts employment to furnish, or agrees to make, or makes, any investigation for the purpose of obtaining, information with reference to . . . [s]ecuring evidence to be used before any court." *Id.*

Two months after the Bureau shared its view, a citation arrived. Compl. Ex. 2. Mr. Fink was to pay a fine of $1,000 and "cease and desist from violating [Cal. Bus. & Prof. Code] Section 7520," which prohibits unlicensed private investigating. So he did. He paid the fine, stopped advertising, turned away new clients, and stopped telling existing clients anything about the spam they had received. ¶¶ 53–59. All signs suggest that, if he were to resume his business, the Bureau would fine him again. ¶¶ 73–82. Or worse. *See* Cal. Bus. & Prof. Code § 7523 (criminalizing

---

[1] *See* Cal. Bus. & Prof. Code § 7522(a) (excluding from licensure many people who do not carry weapons); *id.* § 7542 (laying out the requirements for private investigators who want to carry firearms); *id.* § 7542.1 (requiring private investigators who carry "tear gas or any other nonlethal chemical agent" to complete a training course); *id.* § 7542.12(b) (prohibiting certain uses of firearms).

1   unlicensed investigation).

2          Obtaining a private investigator's license is no small thing. Mr. Fink would need to pass

3   an exam, pay a fee, and—most glaringly—spend 6,000 hours apprenticing in one of eight fields

4   that have nothing to do with finding spam: law enforcement, military policing, insurance adjusting,

5   licensed private investigation, skip tracing, arson investigation, investigations for public defenders,

6   or investigative reporting. Cal. Code Regs. tit. 16, §§ 605 (exam), 639 (fee); Cal. Bus. & Prof.

7   Code §§ 7541(a), 7541.1(a) (training).

8          Rather than spend three years training in fields irrelevant to his business, ¶¶ 70–72, 99, Mr.

9   Fink sued to enjoin future enforcement of the private-investigator laws against him. Requiring

10  three years' training and a license to "review [a] client's email account information" violates the

11  Constitution's free-speech, due-process, and equal-protection clauses. ¶¶ 83–112.

12                                      **LEGAL STANDARD**

13         At the motion-to-dismiss stage, the question is only whether Mr. Fink has pleaded enough

14  facts to cross the low bar that separates "plausible" claims from "speculative" ones. *Fowler*

15  *Packing Co. v. Lanier*, 844 F.3d 809, 814 (9th Cir. 2016). In answering that question, the Court

16  accepts Mr. Fink's allegations as true and "construe[s] all inferences" in his favor. *Ariz. Students'*

17  *Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016).

18                                         **ARGUMENT**

19         Because Mr. Fink has moved for a preliminary injunction, he has already briefed why he

20  is likely to win. ECF No. 15 at 5–14. Here he briefs the issue from the other direction: He has

21  certainly pleaded enough not to lose. Part I discusses the First Amendment—including Mr. Fink's

22  review, creation, and dissemination of information—and why, at this stage, the Bureau cannot

23  carry its burden under any level of First Amendment scrutiny. Part II discusses substantive due

24  process and the Bureau's demand for three years of irrelevant training. Finally, Part III discusses

25  equal protection and the fact that people are free to let others read their email 99.9% of the time.

26  **I.     Mr. Fink's Complaint States a First Amendment Claim.**

27          **A.     Analogous cases support Mr. Fink.**

28         Before rebutting the Bureau's First Amendment arguments one by one, Mr. Fink starts with

-4-

a big-picture point: The Bureau's arguments are limited to abstract legal principles. Those principles are mostly fine, to the extent they do not conflict with *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), the Supreme Court's most recent decision addressing the intersection of free speech and occupational licensing. The problem for the Bureau, however, is that it does not offer cases showing that those principles apply *to facts like these*. That is because they do not. Rather, when plaintiffs are engaged in purely communicative activities, courts apply the First Amendment.

Mr. Fink gave a controlling example in his injunction brief: *Sorrell v. IMS Health*, 564 U.S. 552 (2011). *See* ECF No. 15 at 6–8. In that case, data miners received doctors' prescribing records from pharmacies, extracted useful information, and then sold their findings to pharmaceutical companies—until Vermont prohibited the practice. *Sorrell*, 564 U.S. at 558–59. Mr. Fink does the same thing. He receives emails from his clients, extracts useful information about which emails might violate the anti-spam act, and then returns that information to his clients. The Supreme Court struck down Vermont's prohibition under the First Amendment, *id.* at 579–80, and it is at least plausible (indeed, likely) that California's ban is likewise invalid. (The Ninth Circuit recently reaffirmed all of *Sorrell*'s relevant principles in *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) [*PCHS*]).

Following these lodestars, courts regularly hold that states cannot apply professional-licensing laws to suppress speech. For instance, the First Amendment protects (or likely protects):

- "Death doulas" giving end-of-life guidance without a funeral director's license, *Full Circle of Living & Dying v. Sanchez*, No. 2:20-cv-001306-KJM-KJN, 2023 WL 373681 (E.D. Cal. Jan. 24, 2023); *Richwine v. Matuszak*, No. 1:23-cv-00370-HAB-SLC, 2023 WL 8747471 (N.D. Ind. Dec. 19, 2023);

- An expert analyzing fluid flow in a drainage system without an engineering license, *Nutt v. Ritter*, No. 7:21-cv-00106-M, 2023 WL 9067799 (E.D.N.C. Dec. 20, 2023); and

- Nonlawyers' legal advice about debt collection, *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 103 (S.D.N.Y. 2022), *appeal docketed*, No. 22-1345 (2d Cir. June 22, 2022).

Under the careful analysis in any one of these cases, Mr. Fink would win. In turn, he must be able to survive a motion to dismiss.

1

**B.    This case is about speech, not conduct.**

2

With these cases in mind, it is not hard to see the flaws in the Bureau's motion. It begins

3

(at 4–5) by invoking the state's "police power" to "impose licensing requirements." But "freedom

4

of speech" may not be made to "suffer" "under the guise of regulating conduct." *Ashton v.*

5

*Kentucky*, 384 U.S. 195, 200 (1966). Nor do states have "unfettered power to reduce . . . First

6

Amendment rights by simply imposing a licensing requirement." *NIFLA*, 138 S. Ct. at 2375. So

7

the Bureau's abstract statements just raise the question: Is the Bureau suppressing speech *here*?

8

The answer is yes. The Bureau asserts (at 5–6) that it is regulating mere "conduct" because

9

Mr. Fink "engages in business to furnish and make investigations." But the Supreme Court has

10

been crystal clear in explaining that "the creation and dissemination of information are speech

11

within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570. And that is all Mr. Fink

12

does. If reading emails and sharing a list of them is not speech, nothing is. The Bureau may not

13

suppress that speech by simply labeling it a *profession*; "[s]tate labels cannot be dispositive of [the]

14

degree of First Amendment protection." *NIFLA*, 138 S. Ct. at 2375 (citations omitted); *see also*

15

*Holder v. Humanitarian L. Project*, 561 U.S. 1, 27–28 (2010) (First Amendment applies when the

16

"conduct" triggering statute's application "consists of communicating a message"); *PCHS*,

17

961 F.3d at 1069 (rejecting argument that vocational instruction was conduct). Otherwise, writing

18

a book would be the "conduct of publishing," reporting news would be the "conduct of

19

journalism," and criticizing the President would be the "conduct of politics." *Cf. Richwine*,

20

2023 WL 8747471, at *14. Fortunately, this is not how the First Amendment works. *Id.* And it is

21

similarly irrelevant that Mr. Fink provides his protected speech as part of a business. *Sorrell*,

22

564 U.S. at 567; *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023) ("Does anyone think a

23

speechwriter loses his First Amendment right . . . if he accepts money in return?").

24

It also follows that suppressing Mr. Fink's speech is not merely "incidental" to the

25

regulation of conduct. To characterize a law as regulating non-speech conduct with only an

26

"incidental" impact on speech, the action triggering the law's application must be "the nonspeech

27

element," not the speech itself. *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968). So, in

28

regulating a doctor's conduct of performing abortions, a state may incidentally regulate speech by

-6-

requiring words to obtain informed consent. *NIFLA*, 138 S. Ct. at 2373. Or states may incidentally burden "white applicants only" signs (speech) if the burden is triggered by a prohibition on race-based hiring (conduct). *See Sorrell*, 564 U.S. at 567. Here, however, Mr. Fink engages in no regulated conduct for the Bureau's speech regulation to be incidental to. The action triggering application of the licensing requirement to Mr. Fink *is* his reading and sharing of emails—his speech. The Bureau is thus regulating Mr. Fink's "speech as speech." *NIFLA*, 138 S. Ct. at 2374.

The Bureau's contrary argument rests on two cases, and neither is helpful. First, there is *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022). The panel there felt "bound" by pre-*NIFLA* precedent squarely holding that sexual-orientation "conversion therapy" is conduct subject only to rational-basis review. *Id*. at 1071, 1075. Outside of that unique context, however, the Ninth Circuit has rejected the argument that otherwise-valid economic regulations can be used to classify sharing information as conduct instead of speech. *PCHS*, 961 F.3d at 1069. So *Tingley* has nothing to say about this case.[2] *See Ariz. Att'ys for Crim. Just. v. Ducey*, 638 F. Supp. 3d 1048, 1071 n.12 (D. Ariz. 2022) (refusing to extend *Tingley* to speech regulated by an occupational-licensing law).

Neither does *Eastern Profit Corp. v. Strategic Vision US LLC*, No. 18-cv-2185 (LJL), 2021 WL 2554631 (S.D.N.Y. June 22, 2021). That (unpublished, out-of-circuit) case is largely about whether a contract for wide-ranging geopolitical investigative services is enforceable. It barely touches on the First Amendment, and it only does so after it holds any First Amendment argument waived. *Id.* at *29–30. To be sure, it does briefly describe wide-ranging geopolitical investigative services as "conduct," and it concludes in dicta that Virginia's private-investigator law is not vague or overbroad. But this short discussion does not address the cases Mr. Fink relies on (pp. 5–6, above), and it certainly does not address whether Mr. Fink's limited activity—identifying spam email—is speech or conduct. In turn, it offers little guidance here.

Under "ordinary First Amendment principles," the Bureau is banning Mr. Fink's "speech as speech." *NIFLA*, 138 S. Ct. at 2374–75. As discussed in the injunction brief and below, that ban

---

[2] *Tingley* has also been divisive. It created a split with *Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020), prompted sharp criticism on denial of rehearing en banc, 57 F.4th 1072 (9th Cir. 2023), and fell one vote short of certiorari, 144 S. Ct. 33 (2023). None of that makes *Tingley* bad law, but there is extra reason to hesitate before applying it to extremely dissimilar facts.

1    is subject to strict scrutiny. *See* ECF No. 15 at 6–12.

2              **C.      Strict scrutiny applies.**

3              The Bureau makes three arguments that intermediate, rather than strict scrutiny, applies. In

4    its view, (1) only commercial speech is at issue, (2) the investigator law is content and viewpoint

5    neutral, and (3) this case will open the floodgates. ECF No. 18 at 7, 9–10. All three are wrong.

6              First, this is not a commercial-speech case. Commercial speech "does no more than propose

7    a commercial transaction." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020)

8    (citation omitted). Mr. Fink's *advertising* of his services might qualify. But reviewing and

9    compiling emails does not. *Id.* (holding that IMDb actor profiles are not commercial speech

10   because they do not propose a commercial transaction); *see also Argello v. City of Lincoln*,

11   143 F.3d 1152, 1153 (8th Cir. 1998) (explaining how fortunetelling "is not commercial [speech]

12   simply because someone pays for it").

13             Second, the law is not content neutral. A speech restriction is content based if it restricts

14   speech due to "the topic discussed or the idea or message expressed." *City of Austin v. Reagan*

15   *Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (citing *Reed v. Town of Gilbert*, 576 U.S.

16   155, 163 (2015)). That is how the law applies to Mr. Fink. He may tell his clients anything at all

17   about the emails they've received *except* which ones might be actionable spam. That is a distinction

18   based on content, which triggers strict scrutiny. It does not matter if the Bureau has a benign motive

19   or is playing favorites among viewpoints, *contra* ECF No. 18 at 9, because "an innocuous

20   justification" is not enough to render a content-based law content-neutral, *Reed*, 576 U.S. at 165–

21   66. Given that, the Bureau's reliance (at 9) on *National Ass'n for Advancement of Psychoanalysis*

22   *v. California Board of Psychology* is misplaced. The court's holding that the statute there was not

23   content based turned exclusively on "whether the government has adopted the regulation because

24   of *agreement or disagreement* with the message it conveys." 228 F.3d 1043, 1055–56 (9th Cir.

25   2000) (cleaned up, emphasis added). But the Supreme Court rejected that reasoning in *Reed*,

26   holding that "a content-based purpose may be sufficient . . . to show that a regulation is content

27   based, [but] it is not necessary." 576 U.S. at 165; *see id*. at 167 ("[T]he First Amendment expressly

28   targets the operation of the laws," not "the motives of those who enacted them").

-8-

Nor does *City of Austin*'s distinction between location-based and content-based rules help the Bureau here. There, the Court held that an ordinance distinguishing between billboards on the premises of the business being advertised and those *off* the premises was very "similar to ordinary time, place, or manner restrictions." 596 U.S. at 67, 71. Here, by contrast, the Bureau is not regulating the "time, place, or manner" of Mr. Fink's speech; it is declaring his speech illegal— full stop. And it is doing so because of the content of that speech. Whereas the City of Austin's sign code was "location-based and content-agnostic," the investigator law targets Mr. Fink's speech "based on its communicative content." *Id.* at 69, 76 (citation omitted); *see Project Veritas v. Schmidt*, 72 F.4th 1043, 1056–57 (9th Cir. 2023) (applying this distinction).

Finally, the Bureau argues that applying strict scrutiny to its suppression of Mr. Fink's speech would mean "no . . . regulation of any profession would survive unless it could meet the heavy burden of strict scrutiny." ECF No. 18 at 10 (citation omitted). This, too, is incorrect. Strict scrutiny applies to Mr. Fink because *all* he does is speak, and the law is triggered by the content of that speech. Other licensed professions, by contrast, often engage in non-speech conduct, and their licensing statutes are *triggered* by that non-speech conduct. Doctors, for instance, perform surgery and dispense medication—conduct. Lawyers handle client funds, exercise power of attorney, and appear in court (a non-public forum where the state can restrict speech heavily). A ruling for Mr. Fink would not extend even to private investigation activities that are *conduct*.

The purely communicative work of professionals, however—including lawyers and medical professionals—has long found shelter under the First Amendment. As *NIFLA* made clear just a few years ago, the Supreme Court "has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA*, 138 S. Ct. at 2371–72. And so the "Court *has* applied strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers." *Id.* at 2374 (emphasis added). Likewise "in the fields of medicine and public health." *Id.*; *see also, e.g.*, *Nutt*, 2023 WL 9067799, at *13–15 (engineering). As discussed (p. 8, above), strict scrutiny applies when a person's activity is pure speech and the regulation, as it operates against him, restricts only speech. Mr. Fink's pure speech falls well within this tradition.

1

     **D.**     **Mr. Fink states a claim under any level of First Amendment scrutiny.**

2

3

4

5

6

7

8

9

10

Ultimately, however, the Court need not resolve the level-of-scrutiny dispute at the pleading stage because Mr. Fink has stated a claim under any level of First Amendment review. Even under intermediate scrutiny, applying the private-investigator law to Mr. Fink must be "narrowly tailored to serve a significant governmental interest." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted). It must "directly advance the asserted interest[] and must not be 'more extensive than is necessary to serve that interest.'" *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018). "California's burden under this test is 'heavy,'" *id.*, and it requires real evidence; it "is not satisfied by mere speculation or conjecture," *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

11

12

13

The Bureau cannot meet that burden here. At the pleadings stage, where the complaint controls, the Bureau's tailoring arguments are necessarily speculative. But the Bureau's evidence-free gestures toward narrow tailoring fail even on their own terms.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

According to the Bureau, requiring a state license for private investigating furthers its interest in promoting "health, welfare and safety" in two ways: it (1) ensures "professional competence" and allows the State to monitor "misconduct and negligence," and (2) protects consumers from "false or misleading" or "deceptive practices." ECF No. 18 at 7–8. Yet the Bureau offers nothing to suggest that restricting *Mr. Fink's speech* furthers these interests. Such an abstract conception of its interest in curtailing speech—unmoored from particular facts—is fatal to its narrow-tailoring burden. *See, e.g.*, *Klein v. City of San Clemente*, 584 F.3d 1196, 1203 (9th Cir. 2009) (concluding that, even if concern about litter is a sufficiently important interest, government must demonstrate that "that the type of leafleting engaged in by Klein significantly increases the amount of litter in San Clemente"); *Nutt*, 2023 WL 9067799, at *16 ("The issue . . . is whether the Act actually promotes the public welfare when applied to unlicensed expert engineering reports. On this issue, the evidence is scant."). The Bureau offers broad principles to suggest that it has an interest in silencing Mr. Fink, but it makes no attempt to connect those principles to his speech. Nor could it at this stage. "The government's burden [under intermediate scrutiny] is satisfied only

28

1   when it presents 'actual evidence supporting its assertion[s].'" *Billups v. City of Charleston*,

2   961 F.3d 673, 688 (4th Cir. 2020).

3       To the contrary, the complaint's allegations show why restricting Mr. Fink's speech *does*

4   *not* further the Bureau's asserted interests, and, at a minimum, is not a narrowly tailored means for

5   doing so. For example, as for the Bureau's interest in proscribing "deceptive practices," Mr. Fink

6   specifically alleged that he does not falsely hold himself out as a private investigator. Compl. ¶ 31.

7   He does not challenge any laws forbidding unlicensed individuals from claiming that they are a

8   private investigator. And the Bureau does not contend that Mr. Fink has ever deceived anyone at

9   all.[3] *See Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023) ("[A] state may

10  not restrict protected speech to prevent something that does not appear to occur.").

11      Or take professional competence. Even if the State has an interest in ensuring Mr. Fink's

12  "professional competence" in merely reading, repackaging, and sharing information with his

13  clients, subjecting him to California's hefty private-investigator licensing requirements is not a

14  narrowly tailored way to further that interest. To obtain that license, Mr. Fink would have to spend

15  6,000 hours training in, and passing an exam covering, fields completely unrelated to his line of

16  work. Compl. ¶¶ 64, 69–72, 89. The Bureau has not shown how years of training in fields like

17  military policing, arson investigation, or investigative reporting, *id*. ¶ 66, would improve his ability

18  to identify or communicate with his clients about spam. Nor has it shown that "it seriously

19  undertook to address the problem with less intrusive tools readily available to it." *McCullen*,

20  573 U.S. at 494.[4] Indeed, at this stage in litigation, it cannot. Thus, even if intermediate scrutiny

21  _____

22  [3] In that way, *Gray v. Department of Public Safety*, 248 A.3d 212 (Me. 2021) (cited at ECF No. 18
    at 7) is inapposite. The court there flagged specific "false, uninvestigated information that Gray

23  presented as fact" in affirming denial of his license. *Id*. at 223; *see also id.* at 216–17 (recounting
    accusations of "murder[]" and "execut[ion]" made "with reckless disregard of their truth"). The

24  Bureau here does not suggest Mr. Fink has *ever* failed to "accurate[ly] communicat[e] facts" (nor
    could it at this stage). *See id*.; *cf*. Compl. ¶ 27 ("Jay does not flag emails that are edge cases."); *id.*

25  ¶ 29 ("Jay has never received complaints about his ability to identify actionable spam.").

26  [4] Although it is not Mr. Fink's burden to supply the Bureau with less-restrictive alternatives, they
    certainly exist. For example e, to the extent that the Bureau is worried that Mr. Fink will access

27  sensitive information sent by members of the public to his clients, *see* ECF No. 18 at 11, it could
    require Mr. Fink to include a confidentiality agreement in his contracts.

28

-11-

1    applies, the Bureau hasn't come close to meeting its narrow-tailoring burden.

2        **II.  Mr. Fink's Complaint States a Substantive Due Process Claim.**

3            Mr. Fink has also stated a substantive due process claim. To be sure, the rational-basis test

4    governing that claim is deferential. *See* ECF No. 18 at 10. But it is not "toothless." *Navarro v.*

5    *Block*, 72 F.3d 712, 717 (9th Cir. 1995). Plaintiffs routinely state valid rational-basis claims at the

6    Ninth Circuit[5] and in its district courts.[6] That is because, even in rational-basis cases, evidence

7    matters. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 589–92 (9th Cir. 2008) ("[O]ur circuit has

8    allowed plaintiffs to rebut the facts underlying defendants' asserted rationale for a classification,

9    to show that the challenged classification could not reasonably be viewed to further the asserted

10   purpose."); *accord St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013) ("[P]laintiffs

11   may nonetheless negate a seemingly plausible basis for the law by adducing evidence of

12   irrationality."). When plaintiffs allege facts plausibly undercutting the rational application of a

13   statute, they may proceed to discovery to prove those facts. *Cf., e.g.*, *Lockary v. Kayfetz*, 917 F.2d

14   1150, 1155–56 (9th Cir. 1990) (sending rational-basis claims to trial).

15           Here, Mr. Fink has pleaded more than enough to cross that first hurdle. He alleges that he

16   does not need the knowledge or skills of a private investigator to identify spam or communicate

17   with his clients about it. Compl. ¶ 69. He alleges that expertise in the eight fields counting toward

18   the 6,000-hour experience requirement would do nothing to help him identify spam or

19   [5] *See, e.g.*, *Fowler Packing Co. v. Lanier*, 844 F.3d 809, 816 (9th Cir. 2016); *Ariz. Dream Act Coal.*
20   *v. Brewer*, 757 F.3d 1053, 1063–67 (9th Cir. 2014); *In re Levenson*, 587 F.3d 925, 931–34 (9th Cir.
     2009); *Merrifield v. Lockyer*, 547 F.3d 978, 988–92 (9th Cir. 2008); *Lazy Y Ranch Ltd. v. Behrens*,
21   546 F.3d 580, 589–92 (9th Cir. 2008); *Servin-Espinoza v. Ashcroft*, 309 F.3d 1193, 1196–98 (9th
     Cir. 2002); *Navarro v. Block*, 72 F.3d 712, 716–17 (9th Cir. 1995), *as amended* (Jan. 12, 1996);
22   *Pruitt v. Cheney*, 963 F.2d 1160, 1164–66 (9th Cir. 1991), *as amended* (May 8, 1992); *Lockary v.*
     *Kayfetz*, 917 F.2d 1150, 1155–56 (9th Cir. 1990); *Bunyan v. Camacho*, 770 F.2d 773, 774–76 (9th
23   Cir. 1985); *Parks v. Watson*, 716 F.2d 646, 654–55 (9th Cir. 1983) (per curiam); *O'Day v. George*
     *Arakelian Farms, Inc.*, 536 F.2d 856, 860 (9th Cir. 1976).

24   [6] *See, e.g.*, *Full Circle of Living & Dying v. Sanchez*, 2023 WL 373681 (E.D. Cal. Jan. 24, 2023);
25   *Geiger v. Kitzhaber*, 994 F. Supp. 2d 1128 (D. Or. 2014); *Golinski v. U.S. Off. of Pers. Mgmt.*,
     824 F. Supp. 2d 968 (N.D. Cal. 2012); *Dragovich v. U.S. Dep't of Treasury*, 764 F. Supp. 2d 1178,
26   1188–92 (N.D. Cal. 2011); *Daien v. Ysursa*, 711 F. Supp. 2d 1215, 1236–38 (D. Idaho 2010);
     *Petzak v. Nevada ex rel. Dep't of Corr.*, 579 F. Supp. 2d 1330, 1336–37 (D. Nev. 2008); *Sadri v.*
27   *Ulmer*, 2007 WL 869192 (D. Haw. Mar. 21, 2007); *Lazy Y Ranch, Ltd. v. Wiggins*, 2007 WL
     1381805 (D. Idaho Mar. 13, 2007), *aff'd sub nom. Lazy Y Ranch, Ltd. v. Behrens*, 546 F.3d 580
28   (9th Cir. 2008); *Walsh v. City & County of Honolulu*, 460 F. Supp. 2d 1207 (D. Haw. 2006);
     *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101 (S.D. Cal. 1999).

communicate with his clients about spam. *Id.* ¶ 70. He alleges that the 6,000 hours of training are an immense, pointless burden because, at most, learning how to identify spam takes hours—not years. *Id.* ¶¶ 72, 97–98. He alleges that neither the 6,000-hour experience requirement nor the practice of private investigation itself bears any connection to his business, which he has successfully operated for more than a decade. *Id.* ¶¶ 72, 89, 96. He alleges that he has never once received complaints about his ability to identify actionable spam. *Id*. ¶ 29. And, to sum it all up, he alleges that subjecting him to California's private-investigator licensing requirement will not protect the public or advance any other permissible state interest. *See id.* ¶¶ 101–02.

The Bureau claims that Mr. Fink should have explained "the nature of 'conventional' private investigator training or work or the content of the Bureau's examinations" to *prove* that the state's licensing requirements are irrational as applied to him. ECF No. 18 at 11. This argument is premature. To survive a motion to dismiss, Mr. Fink does not need to exhaustively describe the practices of law enforcement, arson investigation, or investigative journalism to establish the (commonsense) proposition that they are materially dissimilar to reading and identifying spam emails in a junk folder. "At this stage, a complaint's factual allegations need not be detailed." *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 951 (9th Cir. 2019). Instead, his complaint need only contain "a short and plain statement . . . showing that [he] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Mr. Fink has pleaded that the state's licensing requirements, *as applied to his business*, do nothing to ensure competence or consumer protection. And at this stage, the Court must accept these allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Bureau goes on to contend that its application of the private-investigator laws to Mr. Fink is rational because the 6,000 hours of required training would "enhanc[e] his ability to effectively communicate with his clients, understand their needs, develop investigation plans, and avoid client investigative requests that are illegal or unethical[,]" and help him understand the legal proceedings that may result from his speech. ECF No. 18 at 11–12. But Mr. Fink has pleaded precisely the opposite—that obtaining a license would do *nothing* to enhance his ability to identify spam, communicate with his clients about it, or otherwise run his business. Compl. ¶¶ 69–70, 72, 89, 96. (For that matter, the complaint alleges that his clients agree. *See id*. ¶ 29.) And even if

-13-

6,000 hours of training would help Mr. Fink better understand spam-related litigation (it wouldn't: *see id.* ¶ 66 (alleging that none of the eight training fields relate to spam e-mails)), nothing in the complaint alleges that Mr. Fink participates in any way in any spam-related litigation his clients may bring. *See Ariz. Students' Ass'n*, 824 F.3d at 864 ("We limit our review to the complaint.").

At most, the Bureau's concerns might justify requiring Mr. Fink to pass an examination to prove that he understands the basics of confidentiality requirements. But forcing him to undergo 6,000 hours of training in wholly unrelated fields is an exceptionally (read: irrationally) burdensome way to ensure that he can protect confidential information. Courts have held that similarly mismatched licensing schemes fail the rational-basis test. In *Cornwell v. Hamilton*, for instance, the plaintiff was an "African hair braider" who engaged in "natural hair care," but California required her to get a cosmetology license. 80 F. Supp. 2d 1101, 1102, 1107 (S.D. Cal. 1999). The state claimed this would protect public health and safety. But based on record evidence, the court concluded that the 1,600-hour cosmetology-training regime had so little overlap with the plaintiff's "limited range of activities" that applying it to her was irrational. *Id.* at 1108–19. If 1,600 hours of "marginally relevant" training lacks a rational basis, it is at least *plausible* that the 6,000 hours of allegedly *ir*relevant training here lacks a rational basis. Ninth Circuit precedent requires that Mr. Fink have a chance to prove his allegations undercutting the rationality of the Bureau's asserted justifications. *See, e.g.*, *Lazy Y Ranch LTD*, 546 F.3d at 589–92.

### III.    Mr. Fink's Complaint States an Equal Protection Claim.

Finally, Mr. Fink has stated an equal-protection claim. Under equal protection, "similarly situated persons must be treated equally." *Merrifield v. Lockyer*, 547 F.3d 978, 992 (9th Cir. 2008). A plaintiff need not be "similar in all respects to" the privileged group; instead, the plaintiff "must be similar in those respects that are relevant to [the government's] own interests and its policy." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017). As the Bureau points out, Mr. Fink does not allege that he is a member of a protected class for equal-protection analysis. Contrary to the Bureau's view, however, that does not mean his claim "could only rest on a 'class-of-one' theory." ECF No. 18 at 12. A class-of-one claim is "premised on unique treatment rather than on a classification" in a statute. *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008).

-14-

"In contrast, where (as here) the plaintiff challenges a statute . . . that by its terms imposes regulatory burdens on a specific class of persons . . . the classification appears in the text of the statute itself[,]" and the classification receives rational-basis scrutiny. *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 682–83 (7th Cir. 2017); *see Merrifield*, 547 F.3d at 984 (applying rational-basis scrutiny to statutory licensing requirement); *Cornwell*, 80 F. Supp 2d at 1105 (same). The Bureau (at 13) argues only that other people who convey information about emails for "an investigation," like Mr. Fink, are also not exempt from licensure. That is beside the point. Mr. Fink does not allege unequal *treatment* under the statutory restriction. He challenges the statute's classification—that conveying information about others' emails for an "investigation" is prohibited, while conveying information about emails for any other reason is not. The Bureau neither addresses that challenge nor supplies any rational basis for that classification, so its bid to dismiss this claim fails.

Mr. Fink alleges that thousands of Californians look at other people's emails every day. Compl. ¶ 106. Some—such as secretaries and personal assistants—are routinely paid to review and relay the contents of other people's emails. *Id.* ¶ 107. Under the statute, people can read, repackage, and share information in a client's email so long as they do not do so in anticipation of litigation (or with the various other motives forbidden by California's private-investigator laws). *Id.* ¶ 110; ECF No. 18 at 13. But if a client wishes to use that repackaged information as evidence in a lawsuit, it requires a private investigator's license (and the requisite 6,000 hours' training)— all to do the same thing that thousands of people in California do (both for payment and for free) every day without incident. Compl. ¶¶ 109–11. The Bureau does not even argue that there is a rational basis for that statutory distinction. So Mr. Fink's equal-protection claim should proceed.[7]

## CONCLUSION

For the reasons discussed above, the Court should deny the Bureau's motion to dismiss.

Dated: January 16, 2024

---

[7] Mr. Fink's admittedly foreclosed fourth claim, under the Privileges or Immunities Clause, is preserved for appellate review. Compl. ¶¶ 113–16.

-15-

Respectfully submitted,

/s/ Andrew Ward

**SULLIVAN & CROMWELL LLP**
Brendan P. Cullen (CA Bar No. 194057)
550 Hamilton Ave.
Palo Alto, CA 94301
(650) 461-5650
cullenb@sullcrom.com

**INSTITUTE FOR JUSTICE**
Andrew Ward (NY Bar No. 5364393)*
Dylan Moore (ME Bar No. 010327)*
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
ahward@ij.org
dmoore@ij.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that a copy of the foregoing was served on all counsel of record via the Court's CM/ECF system on January 16, 2023.

By: /s/ Andrew Ward
Andrew Ward
*Attorney for Plaintiff*

-17-